UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

GREEN GROW, LLC
    2417 Evarts Street NE,
    Washington, D.C. 20018

    *Plaintiff*,

    *v.*

THE INDOOR FARMER, LLC,
    8116 Indian Peaks Ave #3,
    Erie, Colorado 80516

RICHARD LAMB, and
    8116 Indian Peaks Ave #3,
    Erie, Colorado 80516

MICA RENQUIST,
    8116 Indian Peaks Ave #3,
    Erie, Colorado 80516

    *Defendants.*

Case No. _____

## COMPLAINT AND JURY DEMAND

Plaintiff Green Grow LLC ("Green Grow" or "Plaintiff"), by and through its undersigned counsel, complains and states as follows:

### NATURE OF THE CASE

1. Green Grow brings this action for breach of contract and other myriad claims to recover actual, compensatory, consequential, incidental, lost profits, disgorgement of monies by which defendants have been enriched unjustly, and punitive damages arising from The Indoor Farmer ("TIF"), Richard Lamb ("Lamb") and Mica Renquist's ("Renquist") (collectively, "Defendants"), unlawful acts in breach of their obligations to Green Grow pursuant to contractual

1

4921-3262-5308, v. 5

undertakings made between them pertaining to the design, procurement, delivery and installation of an indoor cultivation system for Green Grow's medical cannabis dispensary located at 2417 Evarts Street NE, Washington D.C. 20018 (hereinafter the "Project"). Defendants were also required to provide Green Grow with consulting services regarding the regulatory compliance necessary for Green Grow to bring its dispensary to market. Defendants' obligations to Green Grow were memorialized in a number of written and oral agreements among the parties (the "Agreements").

2.     The Agreements required Green Grow to make significant advance purchases of equipment and materials based on Defendants' design, recommendations and estimates of specialty materials and equipment required for the completion of the installation of Defendants' proprietary grow system to be used at the Project. Defendants' proprietary grow system is referred to as a "Farmation Station" — the purpose of which is to replace multiple grow rooms that are typically used in indoor cannabis operations.

3.     The initial terms of the Agreements were set forth in a November 2023 Statement of Work ("SOW"), and by its terms was effective from November 24, 2023, until Green Grow was "content with [TIF's] deliverables" and accepted TIF's work. Acceptance of work meant that Defendants would provide Green Grow with an operational turnkey project, complete with functioning Farmation Stations.

4.     While TIF was responsible for the design of the Project, other trades, including but not limited to, architects, general contractors, and engineers among others, were also hired for the Project. As is typical with construction projects, these other trades relied on the Project's designer, i.e., TIF, to complete their work.

2

5.      During the period November 2023 through mid-October 2025, Green Grow fully performed under the Agreements by coordinating and consulting with TIF, making payments to them, and approving TIF's procurement of materials and equipment at Green Grow's cost.

6.      Defendants failed to perform under the Agreements by, among other things, failing to provide adequate staffing and consulting necessary for the performance of its design work, failing and refusing to cooperate with Green Grow's other trades on the Project, failing and refusing to provide required deliverables under the Agreements, and delaying completion while leaving its work incomplete.

7.      In late 2025, TIF abandoned the Project leaving Green Grow with more than $1 million dollars in specialized equipment and materials, purchased at Defendants' direction for use in TIF's proprietary Farmation Stations. Green Grow repurposed what little equipment and materials it was able to in completing the Project.

8.      Green Grow attempted unsuccessfully to negotiate Defendants' return to the Project in an effort to mitigate damages. Ultimately, it was left with no option other than to abandon TIF's Farmation Station cultivation system and replace it with another vertical grow solution at a huge financial loss due to the delays caused by Defendants' breaches and the cost to entirely replace the grow system initially contemplated by Defendants.

9.      When Defendants abandoned the Project in late 2025, Green Grow was left "holding the bag" by virtue of sitting on a supply of hundreds of thousands of dollars worth of specialized equipment and materials, purchased at TIF's direction, much of which has no possible alternative use. As a result, Green Grow was left in the position of having, in reliance on the parties' Agreements and the conduct of Defendants, extended itself to meet Defendants' contractual

forecasts and saddled entirely with the risk of loss resulting under the arrangement.

10.    Green Grow's reliance on the Agreements and Defendants' breaches has resulted in significant damages for which Green Grow contends Defendants are responsible as set out in more detail below.

## PARTIES

11.    Green Grow is a limited liability company organized and existing under the laws of the District of Columbia, with a principal place of business located at 2417 Evarts Street NE, Washington D.C. 20018. Green Grows four individual members are citizens of Georgia and Virginia.

12.    TIF is a limited liability company and, upon information and belief, is organized and existing under the laws of Colorado, with a principal place of business located at 8116 Indian Peaks Ave #3, Erie, Colorado 80516.

13.    Lamb is an individual who, upon information and belief, is a resident and citizen of the State of Colorado and a member of TIF.

14.    Renquist is an individual who, upon information and belief, is a resident and citizen of the State of Colorado and a member of TIF.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a), based upon diversity of citizenship between Green Grow and Defendants and because the amount in controversy exceeds $75,000.

16.    This Court has personal jurisdiction over Defendants. On information and belief, Defendants conduct and solicit business throughout the United States, including in the District of

4

4921-3262-5308, v. 5

Columbia, by contracting to supply their cannabis-related services through the TIF website and by targeting, and selling services to, businesses residing or located in this District. Defendants have also committed tortious acts in this District.

17.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3), and (c) because Defendants are subject to personal jurisdiction in this District, have purposefully directed their commercial activities here, and a substantial part of the events giving rise to Green Grow's claims occurred in this District. Defendants have also committed tortious acts in this District.

## BACKGROUND

18.     Green Grow is a privately held medical cannabis supply company based in the District of Columbia, which owns a dispensary facility located in the District of Columbia that is scheduled to open in May 2026.

19.     Green Grow contracted with Defendants to design, consult, procure, install and complete the turnkey medical cannabis facility that is the subject of this action. Throughout the Project, Green Grow relied on its agent, consultant Phillip Frederick ("Frederick"), to manage the Project and communicate with Defendants, among other tasks (hereinafter Green Grow and Frederick are collectively, "Green Grow").

20.     TIF touts itself as being "The World's First Cannabis Engineer," offering services with respect to cannabis and cultivation facility design in addition to other services.

### The Green Grow-TIF Agreements

21.     In or about 2023, Green Grow entered into discussions with Geaux Higher LLC ("Geaux") for Geaux to provide consultancy services to Green Grow related to complying with the District of Columbia's medical cannabis laws and related sales.

5

22.    In connection with the foregoing discussions or otherwise arising therefrom, Geaux also referred Defendants to Green Grow on or about October 31, 2023.

23.    In the ensuing weeks, Green Grow consulted with Geaux about the Defendants' design capabilities for the Project, ultimately entering into an SOW with TIF on or about November 24, 2023.

24.    The initial stage of the relationship was governed by the SOW. The SOW was of critical importance to Green Grow, because one of the premises of TIF's expression of interest in acting as a designer and installer for Green Grow was that in doing so it would provide Green Grow with a turnkey facility. The SOW, therefore, was meant to and did provide for a complete approach for design of the Project.

25.    The SOW set out the key terms governing the relationship between the parties.

26.    Despite the SOW providing that it "is subject to the terms and conditions contained in the Agreement between the parties and is made a part hereof" no other agreement with respect Defendants' design work was ever formally executed.

27.    The SOW had an undefined effective term from November 24, 2023, until Green Grow was "content with [TIF's] deliverables" and "accepted" TIF's work.

28.    The SOW, entitled "Agreement for Consulting Services to Green Grow LLC" provided, in relevant part:

> **Period of Performance**
>
> The Services shall commence on the signing date and shall continue until the client no longer needs assistance from The Indoor Farmer, for the scope of work defined below.
>
> **Summary**

6

4921-3262-5308, v. 5

[TIF] will create facility designs for the two target prospects in Washington DC. 6400 Chillum Pl & 2617/2619 Evarts St.[1]

. . .

**Scope of Work**

**1.        Immediate Need:**

- Draw a preliminary design of each facility to define the cultivation aspects for the team to review.

- Once the primary facility is chosen, [Renquist] will create a fully developed conceptual facility drawing for that facility, which will be after MJBiz Con.

- Added 11/24: Given the 2-for-1 pricing, full payment is necessary upon execution.

**2.        Credit Program**

- If the client opts to purchase Farmation Stations for their facility, the cost of the designs is credited back to the client.

- Additionally, The Indoor Farmer offers complimentary Cultivation SOPs to all clients using the Farmation Station.

**Deliverable Materials**

High-level facility designs on both properties                        $5000

**Contractor Responsibilities**

[TIF] shall be readily available and **provide the information needed to ensure a pragmatic path to delivery is realized for all parties**. This is achieved through an open and collaborative effort, to ensure the foundational elements of the project are defined before the buildout.

**Fee Schedule**

Contract Execution                                                $5000

---

[1]        Notwithstanding the terms of the SOW, following its execution Green Grow elected not to pursue the site located at 6400 Chillum Place. Consequently, only the Evarts Street location became the parties' focus for the Project.

7

**Completion Criteria**

- The contractor shall have fulfilled its obligations when the following occurs:

- The client is content with their deliverables.

- The review of all tasked items is accepted by both sides.

- And we move to the discussion of the next steps.

(Underlined emphasis added).

29.     As set forth in the SOW, Green Grow opted to purchase the Farmation Stations from TIF thereby entitling it to credit back for the cost of the design as well as delivery of the Standard Operating Procedures ("SOPs"), the latter of which was to instruct Green Grow in the use and maintenance of the Farmation Stations it purchased.

30.     Green Grow relied on Defendants, pursuant to the SOW, to design the cultivation system that is central to the Project and to perform certain installation services, in addition to other work as it related to TIF's Farmation Stations.

31.     Green Grow also relied on Defendants, pursuant to the SOW, to design the Project's cultivation system in a non-negligent and professional manner.

32.     Green Grow relied on Defendants to use due care and to design and install the cultivation system with the level of skill, knowledge and diligence attributable to a professional in the field of cannabis cultivation, design and installation.

33.     As memorialized and modified in numerous emails and conversations after the SOW was signed, Defendants acknowledged their obligations to Green Grow to complete the Project.

34.     As further described below, TIF failed to perform its obligations outlined in the

4921-3262-5308, v. 5

SOW.

35.    In the days following execution of the SOW, on or about November 29, 2023, in Las Vegas, representatives from Green Grow met in person with Defendants at the 2023 MJBizCon — the largest cannabis business-to-business event in the world.

36.    While in Las Vegas, Defendants demonstrated their Farmation Station system to Green Grow via a laptop computer. In doing so, Lamb and Renquist made specific statements about their competencies to Green Grow; in particular, that within the limited square footage of the Project, TIF's proprietary racking system could grow comparatively higher yields of quality cannabis plants versus more conventional vertical grow operations. Lamb and Renquist went on to assure Plaintiff that they could readily handle all the design aspects of a high competency grow operation.

37.    These same representations were reiterated to Green Grow in the first half of December 2023, when Renquist traveled to Washington, D.C. to visit the site of the Project.

38.    Among the representations made by Renquist during his December 2023 site visit was that he possessed the necessary skills to prepare a design layout that worked for the Project, notwithstanding that the Project's space was, in Renquist's words, "tight." Renquist would reiterate his competencies in this regard in emails to Green Grow on or about December 19th and 20th, 2023.

39.    Approximately contemporaneous with Renquist's site visit, Defendants prepared and delivered to Green Grow a document entitled, "Washington DC, Roadmap Services and Decision Matrix from TIF" dated December 13, 2023 (hereinafter, "Roadmap"). The nine-page Roadmap addressed a series of best practices for various stages of the Project, beginning with

9

"preliminary design" through post-construction regulatory compliance. The Roadmap also addressed services that were to be provided by the Defendants, including, but not limited to:

- The DC team is actively seeking a comprehensive white-glove full-service solution that spans the entire spectrum of operations, covering everything from conducting facility assessments and providing strategic recommendations to offering specialized training for head growers. In addition to this, we are providing Standard Operating Procedures (SOPs) and all related operational expenditure (OPEX) deliverables. Our goal is to ensure that every aspect of your operations is not only addressed but optimized for efficiency and success.

- Our cannabis engineer will certify that the facility is suitably qualified and operational before we deploy our resources to set up the facility and implement plans. We will work with the client to assign and deploy resources for post-construction plan implementation.

- Our proprietary financial models and proformas were designed for license applications and live operators, and the models have fully linked algorithms and formulas that we provide via Microsoft Excel Workbook files. Our team has built the most granular economic models for marijuana operators that we have ever seen after years of data collection, analysis, and synthesis. The data can be extrapolated to create graphics, charts, and formattable files for use in Microsoft Word and Excel. Pro forma models are tailored to each facility and state market, and they are designed to predict ROI, future returns, cash flows, profit and loss, balance sheet, production yield, patient and customer count, adoption demand, real estate and leasing, CAPEX and OPEX, 280E implications and taxes, human capital, payroll and benefits, utilities, financial ratios, facility optimization, key metrics, capitalization, valuation, scenario analysis, equipment, multi-state distribution, cultivation and extraction methodology, product mix, and other details.

- The Master Grower outsourcing service is unique and cost-effective. It will directly and positively impact the client, profit margin, and harvest yield. Most industry veterans will agree that marijuana cultivation skills are the most difficult to find compared to other functions. Grower turnover is extremely high, and growing marijuana correctly is extremely difficult. Our service will provide an invaluable education in all aspects of marijuana cultivation. We will equip the client's cultivation team with one-on-one training and guidance in their preferred growing medium (i.e. hydroponic, aeroponic, coco, or soil) or our recommended style. Our Master Growers have experience designing and managing all sizes of commercial grows, including indoor, greenhouse, and outdoor facilities. They do not use any

4921-3262-5308, v. 5

pesticides, herbicides, or fungicides on our plants—the closest equivalent to organic marijuana—and they are experts in facility design, equipment, IPM, cloning, harvesting, breeding, strain portfolios, phenotyping, engineering, and disaster recovery. They have applied decades of trial-and-error and product testing using advanced techniques in horticulture, agriculture, and botany that they are eager to share.

- We take a 12-month calendar and write a "to-do list" for each day on the calendar to dictate the harvest schedule steps and points of overlap. These step-by-step instructions can be tailored to indoor, greenhouse, and/or outdoor grow facilities, in addition to hydroponic, aeroponic, coco, or soil growing mediums preferred by clients.

- We will set up your facility for GACP and GMP readiness with our GACP cultivation SOPs and GMP handling, processing, packaging and distribution processes and procedures, coupled with training in all aspects. Certification in Good Manufacturing Practice (GMP) serves as a standard for quality assurance and regulatory compliance across diverse industries, encompassing pharmaceuticals, food, and medical devices. The GMP practices are simple principles we design to ensure consistent production and control of products in accordance with established quality standards, thereby minimizing risks to public health and safety.

40. Defendants failed to provide the services specified in the Roadmap.

41. Moreover, as a condition of entering into the Agreements, TIF required that Green Grow tie its equipment and materials purchases to TIF's design and installation specifications. The parties' mutual commitment to this requirement was memorialized in emails and meeting minutes, was the subject of numerous revisions to design and installation specifications, and was at all times the basis of Green Grow's expectations, actions, budgeting and business planning.

42. In connection with Green Grow's election to purchase from TIF its "Groundbreaking and Patent-Pending Innovation, the Farmation Station," TIF issued invoice no. 347 dated February, 19, 2024 ("Invoice 347"), to Green Grow in the amount of $1,050,000.

43. Invoice 347 included charges to Green Grow for 39 Farmation Station cultivation units and 547 units of Fohse lighting defined as "Distinguished Led Lighting Manufacturer in the

11

4921-3262-5308, v. 5

United States, Renowned for Their Pioneering Work in Horticultural Science and Engineering, Fohse." The volume of items on Invoice 347 for which Green Grow was charged by TIF was well in excess of what was required for the Project.[2]

44.    Invoice 347 also required a retainer payment to be made by February 23, 2024, in the amount of $455,000. This amount was paid by Green Grow to TIF on or about February 23, 2024.

45.    Additionally, in direct reliance on Defendants' representations made after the SOW was executed, namely, those made in person in Las Vegas and in Washington, D.C. in November and December 2023 as alleged above, and in connection with a resulting agreement after the SOW was executed, Green Grow authorized TIF's purchase of CULTIWOOL® grow medium — the material in which indoor cannabis plants are grown.

46.    The amount of CULTIWOOL® product TIF purchased for the Project is far in excess of what was required, even assuming Defendants' Farmation Stations had been utilized on the Project.

47.    In addition to the materials and equipment that was purchased by Green Grow for the Project, it also paid $10,000 a month to Defendants from approximately December 2023 through August 2024. These monthly payments were made ostensibly for TIF's "consultancy services" related to the Project.

48.    Pursuant to the Agreements, Green Grow paid TIF a partial retainer of $5000 in September 2024, as well as retainer payments of $7,500 for the period January 2025 through July 2025.

---

[2]    The fact that TIF required Plaintiff to over-purchase and overspend on materials not necessary to the Project was confirmed by Plaintiff's replacement designer in late 2025 and early 2026.

4921-3262-5308, v. 5

49.    The SOW was revised and elaborated upon in an email from Lamb to Green Grow and others dated March 4, 2024, entitled "3-5-24 DC Project Updates" ("Project Update"). The Project Update expanded upon the SOW in that it provided more particularized details about the Project, and order in which certain tasks would proceed.

**TIF Fails to Perform for Green Grow as Promised**

50.    Lamb's Project Update was among the first of several emails from Defendants to Green Grow over approximately the next 19 months wherein Defendants made excuses for their lack of performance and inability to deliver milestones on time for the Project.  Lamb's Project Update email began:

> Our primary obstacle has been obtaining a definitive response regarding the high pile limitations in DC, which are linked to the storage of combustible materials and the requirement for sprinkler systems. The challenge we face is locating a liaison in the Washington DC market who can persuasively present our case to the Fire Marshal, emphasizing human safety and the true intent behind the High-Pile regulation.

(Emphasis in original).

51.    Lamb's Project Update also addressed operational and cultivation SOPs, stating in relevant part:

> **OPERATIONAL AND CULTIVATION SOPs:**
>
> After conducting a comprehensive review of all regulatory requirements, I have outlined the high-level obligations for our Operational and Cultivation SOPs (Standard Operating Procedures). This initial framework is the foundation for our ongoing process of building out detailed SOPs to ensure compliance and operational efficiency.
>
> Our approach involves meticulous attention to detail and collaboration with the cultivation team to create SOPs that not only meet regulatory standards but also reflect best practices in the industry. This iterative process allows us to continuously refine and improve our procedures, ensuring that we remain compliant and operationally effective.

13

As we continue to develop these SOPs, we will incorporate feedback from stakeholders and industry experts to ensure that our procedures are comprehensive, effective, and reflective of the latest regulatory requirements.

**OTHER ELEMENTS UNDER OPS:**

Each area is underway.
- Pro Forma modeling
- Org Charts
- Smartsheet project management
- GM job description
- Phase 1 genetics and grow style consult with head FS grower and Warpd Labs.
- Fohse lights are ordered.
- Montel′s final order is pending the high pile determination. They are staged and ready when we tell them which variant to manufacture.

52.    In addition to other failures, TIF failed to deliver SOPs for the Project as promised above and in the SOW and Roadmap.

53.    Yet, notwithstanding this and other failures by Defendants, Defendants had no hesitation in continuing to invoice Green Grow for substantial amounts. For example, Invoice 90, dated August 28, 2024, charged Plaintiff $120,000 for the second installment for TIF's Farmation Stations. The invoice also included a $10,000 consultancy payment for what Defendants described as "Monthly White Glove Cannabis Cultivation for Washington D.C."

54.    Defendants' services were anything but "white glove," as Green Grow was routinely confronted with (i) last minute changes by Defendants for scheduled meetings; and (ii) problems, delays and a general lack of performance by Defendants.

55.    Additionally, Defendants' failures to deliver on their promises and/or the protracted delays for which they were responsible persisted, and included at least the following events:

- In the spring of 2025, scrapping Green Grow's entire "Founding Mothers" program — a six-strain cannabis marketing plan that had been developed by Green Grow with the assistance of Defendants and had been signed off on by Defendants

14

approximately 18 months earlier. And, when Green Grow asked what the reason for Defendants' sudden unilateral decision was to abandon the plan they had previously agreed to, Green Grow's inquiries were met with responses to the effect that "Mica knows what he's doing" and "Mica selects the strains."

- Renquist's statement in May 2025 to Frederick that TIF's Farmation Stations could not support a phenotype with a longer-than-8-week grow period eliminated "Panama Red" and its variants, in addition to many sativa strains in general. This was despite Panama Red being the most sought-after flower on the market and sativa dominant phenotypes being the most popular flower segment in the cannabis market. Such a limitation with the Farmation Stations had never previously been disclosed to Green Grow.

- On July 7, 2025, Lamb advised Frederick that 125 Fohse lighting units had been sold to others by the owner of the warehouse where Defendants were storing the units purchased by Green Grow for the Project resulting in a delay.

- Also in early July 2025, TIF referred a Master Grower[3] candidate named "Kevin" to Green Grow to be onsite at the location of the Project and to assist Green Grow with its grow operation, certifications and training. Yet, when Green Grow repeatedly pressed Defendants in the resulting weeks for a meeting with Kevin in an effort to hire him, Defendants offered multiple excuses for why Kevin was not available. With deadlines for milestones on the Project quickly approaching, Green Grow interviewed and hired its own Master Grower, Kyle Castanon, in approximately the third week in September 2025.

- In the summer of 2025, Defendants subcontracted with a transportation company, Durfee Express Inc. ("Durfee"), to transport a 40-foot shipping container from the Port of Baltimore to Green Grow's D.C. facility. The container held several hundred thousand dollars worth of equipment and materials manufactured in China for the Project. However, in coordinating the container's delivery, TIF failed to provide for a crane and related rigging services for the container to be unloaded at the Project. Consequently, Green Grow was forced to retain its own vendor to provide crane and related rigging services at a cost of $4,866.

- Beginning in mid-August 2025, Lamb told Green Grow that the master MS Word templates TIF uses in connection with drafting and providing SOPs to its clients was, in Lamb's words "compromised." Lamb offered excuses through at least September 2, 2025 but, in any event, never provided Green Grow with the SOPs it

---

[3]   A Cannabis Master Grower (or Head Grower/Director of Cultivation) is a senior-level position responsible for overseeing all aspects of a commercial cannabis cultivation facility. They manage the entire plant life cycle, from propagation and vegetative growth to flowering, harvest, and curing, while ensuring regulatory compliance and maximizing production efficiency. *See* https://share.google/EY0VWJ9G0ZcZHkpKa (last visited March 30, 2026).

4921-3262-5308, v. 5

promised initially in the SOW, the subsequent Project Update or the Roadmap. This was despite Lamb stating in an email dated August 27, 2025, that he intended to "hand over 27 SOPs [that] week."

56.   The wrongful acts and omissions described above occurred despite near weekly conference calls between Defendants and Green Grow personnel that focused on meeting the Project's requirements and deliverables, including the purchases of equipment and materials Green Grow was required to make, but the identification of these requirements and deliverables was rarely the subject of a writing in advance and, more often than not, was based on the apparent whim of Renquist.

57.   The level of Green Grow's monitoring of Defendants' operations reached the point where Green Grow was seeking near daily updates from Defendants.

58.   By late August 2025 Green Grow had grown increasingly weary of Defendants' ability to deliver on its design and installation promises that by then had already caused delays to the Project. Indeed, Green Grow's Frederick realized at this time that Lamb was no longer reporting to him with the frequency and detail that were once hallmarks of his email correspondence.

59.   Notwithstanding Defendants seeming lack of enthusiasm for the Project by August 2025, Green Grow remained committed to the Project and was diligent in communicating with Defendants in search of deliverables.

60.   For example, on September 4, 2025, Green Grow's architect, John Beystehner, ("Beystehner") emailed Defendants in search of "cut sheets for all equipment being installed at Green Grow" that Defendants had promised would be delivered at the end of March 2025.  The email went on to add that Green Grow's general construction contractor, Vantage Construction

16

Corporation ("Vantage") "must have this document on site to demonstrate code compliance" and that "it is now critical for construction and cannot be delayed further."

61.     Certain cutsheets concerning electrical drawings, designs for the Project's fertigation system, safety, fire and construction dimensions remained outstanding on September 23, 2025 and September 30, 2025, when Beystehner again wrote twice to Lamb in search of the same.

62.     Curiously, it was also during this same time that TIF began to claim, for the first time, that its designs were proprietary and that it refused to supply necessary documents to the design team that included, among others, Beystehner, Vantage, and its electrical engineer, Hurst Engineers ("Hurst"). Defendants would reiterate in writing the purported proprietary nature of TIF's Farmation Station grow system when it made Green Grow aware of its abandonment of the Project on October 15, 2025, as further set forth below.

63.     Defendants' refusal to supply its designs to the team began to paralyze the Project as other trades Green Grow hired, by September 2025, were unable to move forward with their work in connection with the Project in the absence of receiving Defendants' design schematics for the Farmation Stations.

64.     As a consequence of Defendants' conduct, Green Grow became very deliberate in its communications with Defendants in an effort to ensure that any "gaps" in communications were addressed and resolved. One such comprehensive email from Frederick dated September 26, 2025, followed shortly after a strained conversion between Green Grow and Defendants just days earlier, wherein he stressed the urgency with which Green Grow needed information from Defendants and read as follows (all errors in original):

17

4921-3262-5308, v. 5

Hello,

Green Grow is writing to follow up and coordinate on several issues, many of which are time sensitive. They are broken out here in numbered points for reference. Please respond to ALL line items.

1. Installation of Farmation Stations remains scheduled for November. Vantage is sending out invites to add IDF to weekly construction meetings with the team starting next week to coordinate. The meeting is Friday at 10:30 AM and will reoccur weekly. If you would like to request 30-60 minute later start time, please respond to Vantage with the request. We can be somewhat flexible but need to organize promptly.
**Provide Confirmation/Adjustment by Tuesday 10/1**

2. Coordination for receipt of the second container from China is incomplete, we need contact information on the receiving side in case of confusion with trucking. Also is it durfee handling the receipt again? If so we would like to reach out to them to make sure timing is coordinated with Able on the receiving end and they are aware of needed space. Mica had promised to send out a BoL. If anything listed can be found elsewhere, assistance in finding the info would be appreciated. **Provide information on or before end of next week 10/3/25**

3. Container #1 is to be inventoried Wednesday, a team has been secured as planned. Mica had sent a message that he would be coming out two days ago. This is an inconsistency. As shown in the transcript attached, Mica asked that we do please inventory the container and promised a bill of lading for cross reference. We are still planning to proceed Wednesday with inventory, Vantage has provided a subcontractor with insurance for scheduled assistance. For Mica to do so, he will need to re-coordinate and he will need Green Grow's assistance for access. Following the plan established last week makes much more sense. If anything listed can be found elsewhere, assistance in finding the info would be appreciated.
**Provide information before next week 10/3/25**

4. Shipments from Montel - Josiah needs both timing and contents measurements. Again this is for coordination and for advanced planning for storage space with Able. If anything listed can be found elsewhere, assistance in finding the info would be appreciated. **Provide information on or before end of next week 10/5/25**

5. As mentioned, installation for Farmation Stations is Scheduled with Vantage for mid November, approximately the 12th. Green Grow needs verbal commitment and coordination from Indoor Farmer. Coordination can be discussed with Vantage but the commitment to construct in November requires confirmation. **Please respond by 10/2/25 so that we are ready for meeting on Friday**

6. Vantage has expressed three areas of concern in buildout for which further design information is critical: Dry room design (for electrical and structural concerns. Would fans need to be plugged in? Where would the racks be mounted, especially on the higher levels?), Pass-through locker alignment/location (so that proper holes in the wall can be framed) and Vantage maintains that cut sheets for Farmation Stations may be needed for inspectors. If you need to pass over agreements for information sharing with Vantage it's understood. John Beystehner also expressed that it would be smart to. Without proper preliminary construction we may have to go back and "redo" certain areas, which will add further time/cost to the project. Understand that John Beystehner's recommendations and requests are considered completely valid. John is not part of a 'game,' he's a very respected architect expressing concerns as he feels necessary. J&M have more than 50 years of experience, John even edited the national architecture certification final exam for several years. **Please have plans or preparations for meeting with Vantage on 10/3. Vantage may have additional needs in follow up that would be a priority.**

7. Next week we will be doing a walk-around video to highlight location of first floor outlets before closing up drywall. Phil can coordinate, and Thursday 10/2 seems like the best day. Your input as well as John Beystehner's is needed, please confirm a time for Thursday that this can be done, roughly 30 minutes should be more than enough. Somewhere between 9am to 3pm EDT (based on the construction team's onsite availability, and time zones) **Provide Confirmation by Tuesday 10/1**

8. David Lebouf has expressed that he has what information he needs at this time, fyi. He has been coordinating with Vantage and our security team and Imran has referred an electrical team to assist David with lighting install. His participation has been much appreciated and he's been a valuable and communicative team member, Jeremy as well. **No Action Needed from IDF, just fyi**

9. Kyle Castanon and team were NOT hired to "take over operations" and were not presented to Indoor Farmer as such. After speaking with the master grower you introduced, Green Grow followed up via email for training rates and information, and there was no response. Green Grow hired another advisor with a proven track record who's team is highly responsive and experienced and came recommended by a trusted acquaintance, Greg McCluskey. It is now up to IDF to work with Kyle to provide understanding of the systems you've coordinated. Kyle needs to develop his understanding so that he can embrace the task and prepare for training. We also need to coordinate for supply orders, staff protocols to be disseminated, genetics sourcing and install and anything else about the operation like completed SOP's. **Please coordinate with Kyle/his team next week and treat him with due respect, as he will do the same**.

Note that everything that Green Grow is doing is time-sensitive, as has been clearly expressed in the past. Green Grow is adhering to a strict timeline and does need

19

Indoor Farmer to do the same. If Indoor Farmer is incapable of meeting any of the necessary timelines, unwilling to communicate to team members, or generally unresponsive, Green Grow will have no choice but to be decisive in making adaptations. The project will proceed according to schedule and Indoor Farmer is expected to work within this framework, and this is not without a sense of understanding. If the Indoor Farmer team requires assistance in handling these processes due to business/time constraints/lack of qualified manpower, Green Grow is ready to have team members step in to take on the task. However, failing to respond or resisting the immediate need to coordinate is not acceptable. Now is the time to truly lay out what IDF can/cannot accomplish reasonably within the timetable and get with the team to execute. Thank you for understanding, everyone will soon be happy to pitch in.

Regards,
The Green Grow Team

(Emphasis in original).

65.    Despite Frederick's email requesting a response to "ALL line items," no substantive response in connection with any of the inquiries above was ever received by Green Grow.

**The 2025 Contract and Settlement Negotiations.**

66.    Approximately contemporaneous with the email above, and arising from Defendants repeated failure to deliver on its promises to Green Grow, Green Grow's counsel prepared a proposed agreement entitled "Consulting Services Agreement" which was delivered to the Defendants on or about October 6, 2025.

67.    The purpose of the Consulting Services Agreement was to obtain from Defendants commitments to the timing of outstanding deliverables and to establish clear equipment procurement and purchasing protocols, among other things.

68.    On October 15, 2025, Defendants responded to Green Grow's proposed Consulting Services Agreement, writing as follows:

20

4921-3262-5308, v. 5

Greetings,

After reviewing your proposed agreement and discussing it with our general counsel, we have determined that a long-term relationship is untenable for both teams. Over the course of our collaboration, persistent challenges and newly introduced concerns have impacted our ability to work effectively together. The erosion of trust and respect on both sides has made it clear that the mutual foundation necessary for a successful partnership is no longer present.

Given these circumstances, The Indoor Farmer is currently working to ensure you can transition to a traditional vertical cultivation platform. **As we cannot permit our proprietary system to be used without our immersive management and control processes in place, we must respectfully request that our system be phased out in favor of a solution that aligns with your team's expertise and operational preferences**. Our technology was designed to operate within a tightly managed framework, and without our direct oversight, we cannot guarantee its performance or integrity.

Since you have already contracted a team competent in traditional vertical cultivation, and you currently have a custom 3-tier system racking platform designed for the space, this transition should allow you to leverage your existing resources and expertise, minimizing disruption and ensuring continuity in your operations. We are committed to supporting you during this period to facilitate a smooth and efficient changeover.

In addition, we will be providing a balanced approach regarding final deliverables, charges, and credited back items in the upcoming days, knowing that timing is of the essence for the GG team. Our goal is to ensure transparency and fairness throughout this process, and we will communicate all relevant details promptly to
support your planning and decision-making.

While the decision to part ways is difficult, we believe it is the most constructive path forward.

Richard Lamb
COO

(Emphasis added).

69.     Notwithstanding the foregoing promises in the wake of Defendants' abandonment

21

4921-3262-5308, v. 5

of the Project, and, in particular, Defendants purported commitment "to supporting [Green Grow] during this period to facilitate a smooth and efficient changeover," nothing approaching any "real" assistance to Green Grow was ever offered. In fact, the opposite was true.

70. The extent of Defendants' proposed assistance was to have Renquist travel to D.C. to "build something" with the incomplete materials and equipment that Green Grow then had on hand. But Defendants' offer, such as it was, did not include designs, proof of structural integrity, or the specialized racking that been ordered to facilitate the support of the Farmation Stations. The ad hoc improvised solution Defendants were offering was in no way acceptable to Green Grow.

71. Additionally, on or about October 17, 2025, and in connection with a second shipping container from China that was docked in the Port of Baltimore and contained specialized racking solutions intended for the Farmation Stations, Defendants confirmed that they had taken affirmative steps, purportedly on the advice of their General Counsel, to frustrate Green Grow's access to the shipment as well as its ability to properly account for what the shipment contained, as no manifest or bill of lading was ever provided to Green Grow despite its multiple requests for the same.

72. As a direct result of Defendants election to abandon the Project in mid-October 2025, Green Grow incurred additional costs in connection with certain redesigns and related construction work as it concerns its cannabis cultivation system, HVAC system and related mechanical work, i.e., duct work, that needed to be redesigned and constructed by various trades, including Dosatron International LLC, Vantage and Remington Construction.

73. The costs associated with these additional remedial efforts total at least $152,154.98, and are in addition to the regulatory consultancy services Green Grow was required

to obtain from PlantMinded Partners LLC ("PlantMinded") as a result of Defendants' breach of its obligations to perform.  The cost for these services, since October 2025, accrue at the rate of $15,000.00 per month, plus an additional one-time consultancy fee of $5000.

74.    PlantMinded has advised Green Grow that the equipment and materials Defendants required Green Grow to purchase taking into account the change in design are far in excess of what the Project required given its square footage and other attributes.

75.    On October 27, 2025, Green Grow's counsel sent Defendants a comprehensive demand letter wherein, *inter alia*, Green Grow sought the recovery of $1,248,457.92 out of $1,503,189 paid to Defendants for undelivered equipment, unnecessarily procured equipment and consequential costs associated with the rigging of shipping containers. The demand for reimbursement was $254,731.08 less, or approximately 20% less than the total amount Green Grow had paid to Defendants since inception of the Project.

76.    Counsel for Defendants responded to Green Grow's demand letter on or about November 7, 2025, requesting that he and Green Grow's counsel have a confidential conversation to which counsel for Green Grow responded the same day he could not agree to, considering his professional and ethical responsibilities to Green Grow.

77.    In an effort to resolve the above-described disputes, counsel for the parties continued to exchange emails through approximately the end of November 2025 but were unable to come to an agreement.

78.    Defendants have refused to pay Green Grow any part of the amount demanded by Green Grow.

79.    As a result of TIF's failure to perform its obligations under the Agreements with

4921-3262-5308, v. 5

Green Grow, Green Grow has:

    i.    borne the cost of materials and equipment purchased by it or on its behalf and in reliance on assurances provided by Defendants that such materials and equipment were necessary for the Project, when they were not;

    ii.    incurred costs associated with excess inventory in connection with the purchase of equipment and materials; and

    iii.    suffered damages in connection with additional costs for certain redesigns and related construction work as it relates to its cannabis cultivation system, HVAC system and related mechanical work, i.e., duct work.

80.    Green Grow's losses have further been exacerbated by the uniqueness of the equipment it purchased at the behest of Defendants, alternative uses for which do not exist. Accordingly, there is no secondary market for the inventory of specialized equipment and materials for Defendants' allegedly proprietary system that Green Grow is retaining in the second shipping container that Defendants purchased — for which Green Grow pays $1,000 a month to store on the site of the Project.

81.    The contents of the second shipping container remain loaded and its contents are of no use to Green Grow given its need to proceed with a more conventional vertical cannabis cultivation system after Defendants abandoned the Project. And, as to the completeness of the shipment, this too remains a mystery, because despite multiple requests by Green Grow, Defendants have refused to provide Green Grow with a bill of lading or any other document that identifies the contents of the container.

82.    Green Grow has retained the aforementioned shipping container in the hope of

receiving documents from Defendants confirming its contents.

83.     Defendants acted willfully, knowingly, intentionally, unconscionably and with reckless indifference to the consequences of their actions when they committed the aforementioned acts.

84.     The wrongful actions and omissions by Defendants alleged above are of a substantial and material nature and have caused Green Grow to incur costs to remedy Defendants' wrongful conduct, and Green Grow has suffered damages in the way of actual damages and out-of-pocket costs.

85.     In recognition that Defendants' Farmation Stations are an utter failure, Defendants' website located at https://theindoorfarmer.net/ no longer advertises these systems. This is to be contrasted with the appearance of the same website in 2024 and 2025, wherein extensive advertisement and discussion of Farmation Stations was present.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF CONTRACT
### (As to Defendant TIF)

86.     Green Grow repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

87.     Green Grow and TIF entered into a series of valid and enforceable Agreements memorialized in:

> i.      the SOW;
>
> ii.     the Project Update;
>
> iii.    the oral and other agreements between them as alleged above; and
>
> iv.     all of the foregoing in the aggregate as a complex commercial arrangement

4921-3262-5308, v. 5

consisting of interrelated business contracts premised on common purposes, understandings and assumptions as alleged above.

88. Green Grow in all material respects performed its obligations under the Agreements between it and TIF.

89. TIF materially breached its Agreements with Green Grow as set forth above.

90. Each of TIF's breaches of the Agreements were willful.

91. Despite receiving due demand, TIF has refused to comply with its contractual obligations.

92. Green Grow has made substantial efforts at mitigating its damages.

93. By virtue of TIF's material breaches of the Agreements set forth above, Green Grow is entitled to restitution.

94. In addition, Green Grow has suffered damages by reason of TIF's foregoing breaches in an amount to be determined at trial, but in no event less than $1,661,313.56.

## COUNT II
## UNJUST ENRICHMENT
### (As to Defendant TIF)

95. Green Grow repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

96. Green Grow relied on TIF's representations that it accepted its commitment to guarantee the performance of its obligations under the Agreements.

97. In reliance on those representations, Green Grow purchased equipment and materials in quantities directed by TIF's written forecasts and repeated oral instructions.

98. TIF was aware of and encouraged the foregoing reliance by Green Grow, which was reasonable under the circumstances.

4921-3262-5308, v. 5

99.    TIF benefitted financially and otherwise by Green Grow's investment in materials and equipment it purchased at the behest of TIF.

100.    TIF benefitted, *inter alia*, from Green Grow's reliance on TIF's directives in that TIF was able to take positive strategic, financial, marketing and other actions, and to avoid concomitant negative actions, based on Green Grow's supply of equipment and operating income throughout their contractual relationship.

101.    Of all the strategic, financial, marketing and other actions TIF was able to take by virtue of Green Grow's reliance, none is more obvious and direct than TIF's ability to service other clients during the period when it should have been focused on the Project.

102.    It would be unjust for TIF to retain the foregoing benefits without TIF providing compensation to Green Grow for the same.

103.    In view of all the above, Green Grow is entitled to restitution.

104.    By reason of the foregoing, Green Grow has also been damaged in an amount to be determined at trial, but in no event less than $1,661,313.56.

**COUNT III**
**PROMISSORY ESTOPPEL**
**(As to Defendant TIF)**

105.    Green Grow repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

106.    Had Green Grow known of TIF's intentions to substantially and materially deviate from its Agreements with Green Grow and the parties' previously established course of dealings, Green Grow would not have, *inter alia*:

      i.     agreed to enter into the SOW;

27

ii.   agreed to the Project Update;

iii.   incurred the costs and risks of purchasing and storing large quantities of materials and equipment with no secondary market or uses;

iv.   giving TIF nearly unfettered control over provisioning and logistical operations;

v.   fulfilled any of TIF's purchase orders, much less at pricing premised on TIF's performance under the Agreements;

vi.   otherwise acted to its detriment in reliance on TIF's serial false representations.

107.   Green Grow has reasonably relied on TIF's repeated and specific promises to its detriment, and has incurred substantial damages in an amount to be determined at trial.

108.   In view of all the above, Green Grow is entitled to restitution.

109.   TIF is also liable to Green Grow for all costs and damages incurred by Green Grow by reason of its reliance on TIF's actions and omissions as set forth above, in an amount to be determined at trial, but in no event less than $1,661,313.56.

**COUNT IV**
**BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
**(As to Defendant TIF)**

110.   Green Grow repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

111.   In every contract there is an implied covenant of good faith and fair dealing.

112.   Through its conduct, as detailed above, TIF breached the covenant of good faith and fair dealing implied in the Agreements between Green Grow and TIF.

4921-3262-5308, v. 5

113.    In breaching the covenant of good faith and fair dealing implied in the Agreements between Green Grow and TIF, TIF did so in bad faith because its conduct included a lack of diligence and a purposeful failure to perform as detailed above.

114.    In view of all the above, Green Grow is entitled to restitution.

115.    Green Grow has also suffered damages by reason of TIF's foregoing breaches in an amount to be determined at trial, but in no event less than $1,661,313.56.

## COUNT V
## FRAUD IN THE INDUCEMENT
### (As to All Defendants)

116.    Green Grow repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

117.    As set forth above, after the SOW was executed, Defendants engaged in several frauds and made numerous intentional misrepresentations to Green Grow regarding their ability and willingness to deliver the Project on an agreed upon schedule, and consistent with the design-related work promised in various Agreements.

118.    In an effort to intentionally inflate additional fees for their services, Defendants purposefully chose to delay delivery of their required deliverables.

119.    In order to induce Green Grow to pay Defendants' inflated fees, Defendants advised Green Grow of alleged changes in market conditions over which they purportedly had no control and made multiple intentional misrepresentations about their ability to deliver the agreed upon deliverables. This included the promise to immediately begin work upon the execution of the SOW and to deliver a completed turnkey facility pursuant to the agreed upon schedule.

120.    Additionally, Defendants misrepresented that they would design and install their Farmation Stations , a purported state-of-the-art  grow system with an accompanying specialized

29

racking system, that would be dedicated solely to Green Grow's needs.

121. Defendants were aware that such statements were false when made, and they were made to induce Green Grow to execute the Agreements with the aim of generating inflated fees.

122. Based upon those misrepresentations, Green Grow entered into other Agreements following the SOW for design work related to the Project.

123. The misrepresentations were justifiably relied upon by Green Grow in agreeing to other Agreements beyond the SOW, and in continuing to work with Defendants through mid-October 2025, notwithstanding Defendants repeated lack of performance.

124. At the time the Agreements were entered into, Defendants had a present intent to not perform the Agreements. Additionally, upon information and belief, Defendants made false statements regarding their products and abilities with the intent to induce Green Grow to enter into the Agreements.

125. In view of all the above, Green Grow is entitled to restitution and/or rescission.

126. Green Grow has also been damaged by Defendants' fraud in an amount to be determined at trial, but in no event less than $1,661,313.56.

## COUNT VI
## FRAUD
### (As to All Defendants)

127. Green Grow repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

128. In order to reap the financial benefits of the large and profitable Project, Defendants knowingly made misrepresentations of material facts, or omitted material facts, on which Green Grow relied to its detriment, as set forth above.

129. For example, without limitation, Defendants knowingly misrepresented their

30

intentions and capabilities with respect to their obligations regarding the Project.

130.    Defendants made these misrepresentations with the knowledge and intention that Green Grow would rely on them to its detriment.

131.    Such reliance by Green Grow was, in the context of the parties' prior course of dealings and of all the facts at hand, reasonable.

132.    In view of all the above, Green Grow is entitled to restitution.

133.    Green Grow has also been damaged by Defendants' fraud in an amount to be determined at trial, but in no event less than $1,661,313.56.

## COUNT VII
## NEGLIGENT MISREPRESENTATION
### (As to All Defendants)

134.    Green Grow repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

135.    To the extent they were not intentional, the truth regarding Defendants' representations to Green Grow regarding material facts as set forth above should have been known to Defendants as self-represented experts in the fields of cannabis cultivation and dispensary design and construction and in light of their legal obligations to Green Grow.

136.    The foregoing actions or omissions by Defendants constitute actionable negligent misrepresentations.

137.    Green Grow relied on Defendants' negligent and false misrepresentations to its detriment.

138.    To the extent the reliance by Green Grow on Defendants' misrepresentations was not foreseen by them, such reliance should have been known to Defendants as self-identified experts in the fields of cannabis cultivation and dispensary design and construction and in light of

4921-3262-5308, v. 5

their legal obligations to Green Grow.

139.    Green Grow's reliance was foreseeable by Defendants.

140.    To the extent the damage to Green Grow due to Defendants' misrepresentations was not foreseen by them, such damage should have been foreseen by Defendants as self-identified experts in the fields of cannabis cultivation and dispensary design and construction and in light of their legal obligations to Green Grow.

141.    Green Grow's reliance was reasonable.

142.    Green Grow has also been damaged by Defendants' negligent misrepresentations in an amount to be determined at trial, but in no event less than $1,661,313.56.

**COUNT VIII**
**CIVIL CONSPIRACY**
**(As to All Defendants)**

143.    Green Grow repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

144.    Defendants are two or more persons acting in concert to commit the tortious conduct set forth above.

145.    Each defendant intentionally and knowingly took steps alleged above in furtherance of their agreement to injure Green Grow by, *inter alia*, engaging in frauds against Green Grow and unjustly enriching themselves, in the process depriving Green Grow of the benefits of what it bargained for.

146.    In view of all the above, Green Grow is entitled to restitution.

147.    As a direct result of Defendants' aforementioned actions, Green Grow has been damaged in an amount to be determined at trial, but in no event less than $1,661,313.56.

4921-3262-5308, v. 5

## PRAYER FOR RELIEF

WHEREFORE, Green Grow, LLC hereby demands judgment from Defendants The Indoor Farmer LLC, Richard Lamb and Mica Renquist for damages jointly and severally, in amount to be determined at trial, including but not limited to compensatory, incidental, consequential damages, lost profits, punitive damages, restitution; disgorgement of monies by which defendants have been enriched unjustly; costs; attorneys' fees; pre- and post-judgment interest; and such other and further relief to which they may be entitled at law and equity.

## JURY DEMAND

Green Grow LLC hereby demands a trial by jury of all claims herein so triable.

Dated: March 30, 2026

Respectfully submitted,

/s/ Thomas R. Lynch

Charles Asmar, Esq. (DC Bar 434984)
Thomas R. Lynch (DC Bar 501420)
Walter Fitzhugh (DC Bar 90017732)
**ASMAR, SCHOR AND MCKENNA PLLC**
5335 Wisconsin Avenue, NW, Suite 950
Washington, D.C. 20015
Tel.: 202-244-4264
Fax :202-686-3567
Email: casmar@asm-law.com
        tlynch@asm-law.com
        wfitzhugh@asm-law.com

Joel G. MacMull, Esq. (*Pro Hac Vice Admission Forthcoming*)
Jacqueline Greenberg Vogt, Esq. (*Pro Hac Vice Admission Forthcoming*)
**MANDELBAUM BARRETT PC**
3 Becker Farm Road
Roseland, New Jersey 07068
Tel.: 973-736-4600
Fax: 973-325-7467
Email: jmacmull@mblawfirm.com
        jvogt@mblawfirm.com

4921-3262-5308, v. 5

_____

34

4921-3262-5308, v. 5